THE PEOPLE OF THE STATE OF NEW YORK, Appellant, *v.* JOSEPH TOWER, Respondent.

Fourth Department, April 11, 1963.

*Carman F. Ball, District Attorney (Leonard Finkelstein* of counsel), for appellant.

*Pacini & Runfola (Joseph P. Runfola* of counsel), for respondent.

*Per Curiam.* The defendant-respondent was indicted for the crime of burglary and larceny on February 24, 1961, jointly with one Edward Loomis. The police did not succeed in apprehending the defendant-respondent until June 1, 1962, when he voluntarily surrendered to the police. The defendant was arraigned on that day and entered a plea of not guilty, and thereafter moved for a dismissal of the indictment because of delay in prosecution, pursuant to section 668 of the Code of Criminal Procedure. The motion was granted by the County Judge upon the basis of affidavits submitted to him; no hearing was held and none was requested either by the People or by the defendant.

Upon the basis of the affidavits before the County Judge, we find, contrary to the conclusions of the County Judge, that the defendant was aware of the outstanding indictment against him throughout substantially the entire period between the date of the indictment and the date of his arraignment and that he evaded apprehension by the police throughout this time. It appears that inquiry was made on February 11, 1961, prior to the finding of the indictment, by Detective Sergeant Quinn at the home of the defendant's mother, where, according to the latest information which the police had, the defendant was residing. At that time, a girl who identified herself as the defendant's sister was informed that the police were looking for him. In March, 1961, after the finding of the indictment, the same police officer talked to the defendant on the telephone and told him he was wanted by the police, and advised him to give himself up. The police were not aware of the whereabouts of the defendant, but the telephone connection had been arranged by one Elizabeth Runfola, a friend of the codefendant Loomis. Another police officer called on the defendant's mother in March, 1961, and was told by her that she had not seen the defendant or heard from him in several months. The mother of the codefendant Loomis telephoned the defendant's mother on February 15, 1961, and advised her that the police were looking for her son on a burglary charge. On several occasions thereafter, she repeated the call. Sometime in April, 1961, Mrs. Loomis talked to the defendant himself on the telephone and told him that the police were still looking for him.

The codefendant Loomis was arrested by the police; he was arraigned on February 27, 1961; thereafter on April 7, 1961, he

pleaded guilty to the reduced charge of petit larceny and was given a suspended sentence thereon.

Miss Runfola, the friend of the codefendant Loomis, referred to above, stated in her affidavit that she was advised on February 12, 1961, that Loomis had been arrested and she was told by Sergeant Quinn that he was trying to pick up the defendant on the same burglary charge. Miss Runfola talked to the defendant on the telephone three or four times and told him that Sergeant Quinn was looking for him on a burglary charge and that he should give himself up. Sometime in March, 1961, Sergeant Quinn was at her place of employment and while he was there the defendant called Miss Runfola on the telephone and she again informed him that the police were still looking for him and then she handed the telephone to Sergeant Quinn. She heard Sergeant Quinn ask the defendant " to turn himself in and make things good for both him and Eddie Loomis ", and she heard Tower reply that " he would think it over ". Subsequently, she talked to Tower on one more occasion and again asked him to give himself up.

The defendant submitted an affidavit asserting in general terms that he " had never received any information nor even been approached by the Buffalo Police Department or other police authorities relative to his being wanted for the crimes charged under the aforementioned indictment ". But he did not deny specifically any of the conversations with Sergeant Quinn, Mrs. Loomis or Miss Runfola, sworn to by them in their respective affidavits. Neither was any affidavit submitted by Tower's mother contradicting any of the statements made in the affidavits concerning conversations with her.

The defendant in his affidavit points out certain facts which he argues should have led diligent police authorities to ascertain his whereabouts and to catch up with him, despite his attempts to evade the police. He asserts that he worked in two different places in Buffalo from April 5, 1961 to March 9, 1962; that he applied for a marriage license on November 14, 1961 and that a notice of the application was published in the local newspapers; that he was married on November 25, 1961. He states that prior to the date of his marriage he resided with his mother at 1732 Genesee Street, which was also the address given in his marriage license application, but significantly he does not state where he resided after his marriage or whether his place of residence was listed in any telephone or city directory. The defendant also states that on June 24, 1961 he was convicted of an infraction of the Vehicle and Traffic Law by a Justice of the Peace in the Town

of Evans, a town in Erie County, and was fined $50 and was placed on probation for its payment.

The defendant contends that he surrendered to the police because his wife saw his photograph in the window of a department store, accompanied by a notice that he was wanted by the police, and she informed him of this and shortly thereafter, he voluntarily surrendered to the police.

The police may well be criticized in this case for lack of diligence in apprehending the defendant, but certainly the defendant is in no position to complain of it. A defendant who successfully evades arrest for a prolonged period cannot take advantage of the resulting delay in prosecution as a ground for dismissal of the criminal charge.

The affidavits established overwhelmingly that the defendant knew the police were looking for him for months before his surrender, and that he chose to evade apprehension. If the defendant had desired to have a speedy disposition of the charge against him, he could have had it at any time by disclosing his whereabouts to the police. The defendant's conduct certainly indicated that he was "not intent on a speedy trial" (*People* v. *Piscitello,* 7 N Y 2d 387, 388). There is nothing in the principle of the *Prosser* case (309 N. Y. 353) which authorizes a dismissal of the indictment for delay in prosecution under these circumstances. In every case in this State in which an indictment has been dismissed because of delay in arraignment under the principle of the *Prosser* case, the defendant was actually in the custody of the public authorities of this State throughout the period of delay, or he was in the custody of public authorities elsewhere and could readily have been brought into the State for arraignment.

The order appealed from should be reversed and the indictment reinstated.

WILLIAMS, P. J. (dissenting). It is provided in both section 8 of the Code of Criminal Procedure and section 12 of the Civil Rights Law that in a criminal action the defendant is entitled to speedy trial. These sections are implemented by, but not necessarily dependent upon, section 668 of the Code of Criminal Procedure, which provides: "If a defendant, indicted for a crime whose trial has not been postponed upon his application, be not brought to trial at the next term of the court in which the indictment is triable, after it is found the court may, on application of the defendant, order the indictment to be dismissed, unless good cause to the contrary be shown."

The burden of showing "good cause" why the indictment should not be dismissed under section 668 is on the prosecution. (*People* v. *Bryant,* 12 N Y 2d 719, 720; *People* v. *Wilson,* 8 N Y 2d 391, 396; *People* v. *Prosser,* 309 N. Y. 353, 361.)

After examining the affidavits submitted and hearing arguments, the County Judge found that the prosecution had failed to show "good cause" for a period of delay of more than 15 months between the indictment and the arraignment. There were ample reasons for the County Court Judge to so find, and his determination should not be disturbed.

The explanation of the delay by the prosecution is novel and astounding. In essence it is founded upon the failure of the defendant to surrender to the authorities when, it is claimed, he knew that he was wanted. The majority opinion finds that in failing to surrender he was evading apprehension. Under the facts of this case, this amounts to a determination that the failure to accept an invitation to surrender makes one an evader. An examination of the facts will disclose that there was almost no effort on the part of the authorities to apprehend the defendant. In fact, his arraignment on June 1, 1961 came about as a result of his surrender to the authorities after he found that he was wanted, and not as a result of any diligence whatsoever on the part of the law-enforcement agencies. The defendant contends that he did not know he was wanted until the last of May. This seems logical because if he had successfully evaded apprehension prior to that time there would have been no point in his surrender on June 1.

Defendant was indicted on the 24th of February, 1961, for burglary in the third degree and grand larceny in the second degree, each alleged to have occurred on February 11, 1961, in the City of Buffalo, Erie County, New York. From that time on there was never any aggressive action taken by the police to apprehend the defendant and so that the case could be brought to trial. From the time of the indictment to the time of his apprehension the defendant resided in the City of Buffalo. Prior to November 25, 1961, when he was married, he resided with his mother at 1732 Genesee Street, Buffalo, New York. His affidavit does not show where he resided after his marriage but it does state that, from the time of his indictment until he surrendered, he never left the limits of the metropolitan area of Buffalo, New York. From April 5, 1961, until March 9, 1962, he worked continuously at the Deaconess Hospital in Buffalo. On March 12, 1962, he left the employ of Deaconess and commenced working at the GLF Mills in Buffalo. He was still employed there at the time of his arraignment. On November 14, 1961,

he applied for a marriage license, and his application was published in the *Buffalo Evening News,* a newspaper of large general circulation throughout the City of Buffalo and its environs. He was married on November 25, 1961, in a public ceremony at a Roman Catholic church in Buffalo. Following the wedding, a reception was held at the Polish Falcon Hall. It was attended by approximately 400 people. On June 24, 1961, he was convicted for an infraction of the Vehicle and Traffic Law in the Town of Evans, which is outside the City of Buffalo but within the County of Erie. He was fined $50 and directed to pay it to the Erie County Probation Department. The fine was paid, and he was discharged from probation " with improvement " on August 30, 1961, as evidenced by a letter from the Erie County Department of Probation. During his employment at both the Deaconess Hospital and GLF Mills, he filed both Federal and State income tax returns. Finally, on or about May 31, 1962, his wife called his attention to the fact that his photograph was in the window of a Buffalo department store with the caption " WANTED ", whereupon he immediately surrendered to the authorities.

The affidavit of the detective sergeant in charge of defendant's apprehension is a picture of inefficiency, inertia and lack of interest. His only explanation for his failure to apprehend the defendant was that on February 10, 1961, he learned that Tower lived with his mother at 1732 Genesee Street and he sent " his squad " to the house. There a girl who identified herself as the defendant's sister was informed that the police were looking for him. " [D]uring the investigation " he became acquainted with a girl who was a friend of Loomis, a codefendant, and she passed him information as to Joseph Tower. Just what this information was and how he used it, if at all, is left to pure conjecture. He claims that on March 6, 1961, he actually talked with Tower and told him he was wanted by the police and " advised him to give himself up ". He does not state that he asked Tower where he lived, where he worked, or that he tried to get any information whatsoever which would assist in the apprehension of the defendant. In the middle of March, 1961, the detective sergeant asked a detective to contact the defendant, but the detective was told by the mother of the defendant that she had not seen or heard from him in several months. This apparently satisfied him, and no further efforts to locate or apprehend the defendant are shown although, as I have stated, the defendant finally surrendered in June of 1962, or about 15 months later. It is obvious that nothing was done after the middle of March and it is equally obvious that there might well

not have been an arraignment on June 1 had not the defendant voluntarily surrendered himself.

The prosecution also claims that Mrs. Matilda Loomis, the mother of the codefendant, stated to the detective sergeant that on February 15, 1961, she had called the defendant's mother and told her that the police were looking for him and that in April, 1961 she also had talked with the defendant on the phone and told him the police were looking for him. It seems that everybody except the Buffalo Police Department could locate and talk with the defendant. However, this is the substance of the effort of the prosecution to show good cause for delay. It is a sorry record of either inefficiency or lack of desire to apprehend the defendant.

Perhaps an examination of the treatment of the codefendant Loomis may give some indication of why there seemed to be no particular anxiety to arrest the defendant. It shows true speed in bringing a case before the court. Loomis was arrested and was thereafter arraigned on February 27. He pleaded not guilty to the charges of burglary, third, and grand larceny, second, was permitted to withdraw his plea and entered a plea of guilty to petit larceny. He was sentenced on the 26th day of April to the Erie County Penitentiary for one year and fined $500. Sentence was suspended, and he was placed on probation. Thus, his case was disposed of and fully concluded about two months after his indictment. I need not add that a suspended sentence on a petit larceny plea is far different from an accusation of burglary in the third degree and grand larceny in the second degree. While this apparent reduction of the magnitude of the alleged crime may perhaps account for the lack of diligence in executing the warrant of arrest in this case, it does not, of course, justify it.

It appears that the defendant, from the time of the indictment on, led a normal life, continued his normal role in society, was steadily employed and that his whereabouts not only was known but was published. I cannot, by any possible logic, call this "evasion."

It is not the obligation of an accused to seek the prosecutor. Diligence in apprehension, as well as in prosecution, is a part of a general plan of action that will result in a speedy trial. It follows, of course, that there can but be delay in prosecution if there is delay in arrest. The obligations of the prosecution and the defense are well discussed in the *Prosser* case (309 N. Y. 353, *supra*). Judge FULD remarks that in some States it has been said that, if the defendant does not affirmatively and promptly make known his desire for a speedy trial, he may not

be heard to complain. This places upon the defendant the burden of obtaining a prompt trial. In other States it is said that the burden of proceeding promptly is on the State, not on the defendant. A pronouncement of the Oregon Supreme Court in *State* v. *Chadwick* (150 Ore. 645, 650) is quoted, as follows: '' When the state sees fit to charge a defendant by indictment with the commission of a crime, it is equally the duty of the prosecutor to see that defendant is arraigned and enters a plea and speedily brought to trial, as it is to charge him with the offense in the first place ''. (309 N. Y. 353, 358.) The *Prosser* opinion then observes that the second view, as pronounced in the *Chadwick* case is the one that is sounder and more persuasive. ''It is the state which initiates the action and it is the state which must see that the defendant is arraigned. It is likewise the state which has the duty of seeing that the defendant is speedily brought to trial. [Footnote omitted.] And from this it follows that the mere failure of the defendant to take affirmative action to prevent delay may not, without more, be construed or treated as a waiver.'' (*Ibid.*)

\* \* \*

'' The sole purpose of section 668 when enacted, therefore, was to provide relief for persons denied a speed trial (see *People* v. *Beckwith,* 2 N. Y. Crim. Rep. 29), and it imposed no obligation on the defendant affirmatively to seek such a trial or be deemed to have waived it.'' (*Id.,* p. 359.)

Finally, at page 361, it is stated: '' It may well be that adherence to the rule here announced will on occasion result in the discharge of one guilty of crime, but, as to that, we need but say, as we did in *People* v. *Jelke* (308 N. Y. 56, 68), that our decision ' transcends the issue of \* \* \* [a particular defendant's] guilt or the disposition of [a] particular case.' ''

A speedy trial can just as well be defeated by a failure to arrest as by a failure to move a case for trial after arrest. In fact, the specific language of Judge FULD in the *Prosser* case applies as well to the duty to see that a defendant is arraigned as to the duty to see that he is brought to a speedy trial after arraignment (*id.,* p. 358). For, as I have observed, where the accused is readily available to the prosecutor, whether he be then incarcerated or, as in this instance, available for apprehension, he may not be denied his right to a speedy trial through lack of diligence on the part of the law-enforcement authorities. (See, also, *United States* v. *Dillon,* 183 F. Supp. 541, 543.)

The facts of the case of *United States* v. *Kojima* (3 Hawaii Dist. 381) are strikingly similar to those in the present case.

There, the defendant was indicted in Honolulu. During the entire time after the filing of the indictment and until arrest, the defendant was living in Honolulu, where he was engaged in business, part of the time as a barber and part in other employments. His business as a barber was advertised under his name in two of the local Japanese newspapers. "[H]e was engaged like other men in earning a living in Honolulu during the whole time since the finding of the indictment and up to the time of his arrest" (p. 383).

Of real interest, in the present case, is the following language contained in the *Kojima* opinion (p. 385): "The point is made that the defendant knew during the period referred to that there was an indictment against him. This is admitted in the testimony and he testified that he engaged a Japanese adviser to look into the matter and paid him a fee therefor; that this man later reported to him that the case was dropped. It is not the duty of a man who is charged with a crime to take the initiative and surrender himself to the authorities; he is within his rights if he remains attending to his business as usual, and is not to be prejudiced by the fact that he has not surrendered himself, although the authorities have failed to execute the warrant for his arrest."

The court granted the motion to discharge the defendant on the ground that he had not been afforded a speedy trial as prescribed by the Sixth Amendment to the Constitution.

This case was recently followed by the District Court of Appeal of California which held that failure to arrest a defendant for 140 days after the filing of a misdemeanor complaint constituted on its face a deprivation of the right to a speedy trial when the defendant was at all times available for trial. (*Rost* v. *Municipal Court of Southern Judicial Dist., California*, 184 Cal. App. 2d 507.)

That the duration of the delay in this case, absent any waiver, was sufficient to effect a deprivation of the right to speedy trial cannot be seriously questioned. In *People* v. *Bryant* (12 N Y 2d 719, *supra*) the court found that a delay of nearly two years was prima facie unreasonable, and the indictment was dismissed. In *People* v. *Wilson* (8 N Y 2d 391, *supra*) a reindictment was dismissed because of a delay of about 21 months under the original indictment. *People* v. *Piscitello* (7 N Y 2d 387) is relevant. There the District Attorney acknowledged that a delay of 17 months constituted a denial of a speedy trial to which defendant was entitled and that, if a motion had been made at the time of the arraignment, the motion would have had to be granted (*id.*, p. 389). (See, also, *People* v. *Masselli,* 17 A D 2d

367 [dismissal for delay of about 10 months of a retrial] and *People* v. *Mudra,* 12 Misc 2d 438 [case dismissed because of a 14-month delay].)

*People ex rel. Harty* v. *Fay* (10 N Y 2d 374, 379) contains these statements by Chief Judge DESMOND: " This State has a strong policy against unreasonable delays in criminal causes and it has been enforced to the full   *   *   *.   We cannot list in advance all the circumstances which will justify long delays.   We know that they are unavoidable in many instances.   The rule we make is to be applied to extremely long and unreasonable delays only."

We are here confronted with what, under the circumstances, was an extremely long and unreasonable delay.

In my opinion, the order should be affirmed and the indictment dismissed.

GOLDMAN, HALPERN, McCLUSKY and HENRY, JJ., concur in *Per Curiam* opinion; WILLIAMS, P. J., dissents and votes to affirm in opinion.

Order reversed on the law and facts and indictment reinstated.