OPINION OF THE COURT
Peter P. Rosato, J.
Pursuant to the decision and order of the Honorable Lawrence N. Martin, dated January 17, 1983, a speedy trial hearing was held before this court to determine the narrow issue under CPL 30.30 (subd 4, par [c]) as to whether or not the delay herein was attributable to the defendant’s absence and whether or not defendant’s location could not be determined by due diligence during the period between the issuance of the arrest warrant on April 15,1981 and his eventual arraignment on a sealed indictment following defendant’s arrest in Arizona on July 19, 1982. The defendant has conceded that lawful procedures were followed subsequent to defendant’s arrest in Arizona on July 19, 1982, so that the period of time from the afore-mentioned July, 1982 date up to the present is not at issue.*
*777 CONCLUSIONS OF LAW
To this court’s knowledge, there are no reported cases in this State interpreting the concept of “due diligence” in the situation presented here, where a defendant, unaware that criminal charges are pending against him, is apparently living openly and notoriously in a sister State. Were this a situation where the defendant was actually incarcerated in a sister State, the answer would be relatively simple, i.e., any “sincere request”, either by letter or by phone, for the return of the defendant, would suffice. (See People v Winfrey, 20 NY2d 138; People v White, 51 AD2d 221.) In the instant situation, however, the court has little more to go on than those cases which hold, generally, that a “reasonable effort” to locate the defendant is all that is required. (See People v Donohue, 66 AD2d 802; People v Jensen, 109 Misc 2d 813; People v Davis, 80 Misc 2d 301; People v Mainor, 77 Misc 2d 946.) This would appear to be a fluid concept, one not susceptible of any hard and fast rules, but rather one calling for resolution on a case-by-case basis.
In attempting to determine what was “reasonable” in the context of this case, one overriding fact became clear as the hearing progressed, namely, that this is not a case of a defendant, knowing he has been charged with a crime, attempting to flee or otherwise evade apprehension. (Cf. People v Tower, 18 AD2d 284; People v Manley, 63 AD2d 988; People v Miller, 61 AD2d 1036.) Rather, the testimony here is that defendant did not become aware of the outstanding warrant until his customer, Chris Miller, was mistaken for the defendant in California on March 16, 1982, almost a year after the warrant issued. Moreover, looking at all the customary and standard guideposts at the disposal of the Westchester County authorities, this court can only conclude that had such guideposts been checked in anything but a cursory and superficial manner, they would inexorably have led the police to defendant’s Arizona residence. For example, Detective Sergeant DeMarco testified that he received no forwarding address for the defendant from the post office. Yet, we have in evidence defendant’s Exhibits B and D which are, in fact, change of address cards for the defendant and Jane Young. In this regard, the instant case would seem to be clearly distin *778 guishable from People v Manley (supra), where the Second Department held that the actions of the police, including interviews with the neighbors and the letter carrier, were sufficient to meet the “due diligence” standard. However, there was in Manley absolutely no countervailing proof visavis any forwarding address such as we have here. In addition, Detective Sergeant DeMarco further testified that he ran a motor vehicle check. Yet we have the uncontroverted testimony of Richard Leddy that the defendant arrived in Arizona in April, 1981, driving a 1976 blue Camaro bearing New York plates, which the defendant testified was registered in his name.
Aside from the testimony concerning the defendant’s car and the forwarding address, Detective Sergeant DeMarco also testified that he was informed of the Arizona telephone number sometime in April of 1981, and that the Arizona police reported back that that number was listed to the Date-Land Water Co. at 8935 N. Mesa Verde Road, Tucson. Yet, even though he assumed that defendant was in Arizona, Detective Sergeant DeMarco waited some 11 months before going to Blasberg Motors to interview their payroll manager, Ms. Lynch, in March of 1982, apparently motivated by the news that Chris Miller had mistakenly been arrested for the defendant at that time. Even then, Detective Sergeant DeMarco failed to ask her the one question that could have tied all the pieces of information together, namely, did defendant leave any forwarding address. In fact, Ms. Lynch testified that she had forwarded defendant’s W-2 form to a post office box in Cortaro, Arizona, which just happened to be Richard Leddy’s mailing address. In addition, the record reflects that the Westchester County warrants squad was aware of the Tucson phone number listed to the Date-Land Water Co. throughout virtually the entire period that the warrant was outstanding. In short, it appears we have here an “Alphonse and Gaston” situation — the Westchester County and Dobbs Ferry police taking one quick stab at locating defendant early on and then, upon learning of defendant’s Arizona phone number, relying on Arizona to follow through. Unfortunately, the Arizona authorities, after learning that a water company was located on the premises, apparently *779 were either thrown off the track or simply made no further effort to either question the owner of the property, Richard Leddy, or to otherwise check out the living situation on his property. Moreover, unlike the members of defendant’s family or defendant’s former girlfriend, Donna Cunningham, the police, from the record here, would have had no reason to avoid approaching Mr. Leddy out of fear that he would have “tipped off” the defendant. There is nothing in the record to controvert Mr. Leddy’s testimony that if the police had only asked him, earlier on, if he knew of defendant’s whereabouts, he would have told them, since he, too, testified that he was unaware that defendant was being sought until the March, 1982 incident with Chris Miller. And, in fact, Leddy did inform the police that defendant worked at Desert Corvette when they finally stopped him while driving the defendant’s Camaro in July, 1982.
However, this court is not going to attempt to apportion blame between New York and Arizona, nor is such an apportionment necessary. Rather, as Judge Burton Roberts stated in People v Santos (76 Misc 2d 158, 161) “[t]he most important point, however, is that it does not matter to Santos which State is responsible for the delay — the impact on him is precisely the same.” Nor is the court going to second-guess the calculated risk taken by the Dobbs Ferry and Westchester County police in deliberately choosing not to question any member of defendant’s family or, for that matter, Detective Cunningham’s daughter, Donna, as to the defendant’s whereabouts. The risks inherent in such an approach were illustrated by the testimony of both the defendant and Richard Leddy concerning the phone call defendant received in Arizona, placed either by Donna Cunningham or by defendant’s brother, informing the defendant of the arrest, evidently on charges unrelated to this case, of one Robert Rauch, a fellow former employee of Blasberg Motors. Finally, this court is in no way suggesting that the Westchester County authorities must personally go out to the sister State in such a situation as was presented here, given the volume of outstanding warrants and the limited number of available personnel. (Cf., however, People v Beltran, 88 AD2d 830, 831, where the First Department held that the efforts of Detective Paul, *780 which did include two personal trips to Puerto Rico, were “sufficient to pass muster”.)
Rather, all the court is saying here is that, given the fact that defendant was unaware of the existing charges, there is nothing on this record to justify the conclusion that defendant was trying to evade capture. Quite to the contrary, the record shows that as soon as defendant did learn that he was being sought in March of 1982, he did contact the Westchester County authorities through an attorney, and made at least some effort to return. Moreover, it would seem to this court that anything more than the most superficial effort by the combined forces of the Dobbs Ferry and Westchester County police, given the quantum of information which appears on this record, Would almost inevitably have led them to the N. Mesa Verde address in Tucson at a much earlier point in time.
Accordingly, the court would find that sufficient due diligence to locate the defendant was not exercised, that defendant was not “absent” within the meaning of CPL 30.30 (subd 4, par [c]) and that therefore the instant indictments, insofar as they relate to this defendant, must be dismissed.
[Portions of opinion omitted for purposes of publication.]

 Under Indictment No. 81-00136, defendant and codefendant Victor Amicucci are charged with criminal sale of cocaine in New Castle on Sept. 5, 1980; under Indictment No. 81-00146, defendant is charged, alone, with the sale of cocaine in Dobbs Ferry on Sept. 8, 1980.