**Zenous WHALEY, Petitioner,**

v.

**Ramon RODRIGUEZ, Chairman, N.Y. Board of Parole, Respondent.**

**No. 86–CV–940 (JBW).**

United States District Court, E.D. New York.

April 8, 1987.

---

The Legal Aid Society, New York City by Lynn W.L. Fahey, Andrew Abraham, for petitioner Zenous Whaley.

Elizabeth Holtzman, Dist. Atty. of Kings County, Brooklyn, N.Y. by Richard T. Faughnan, for respondent.

## MEMORANDUM AND ORDER

WEINSTEIN, Chief Judge.

Petitioner seeks a writ of habeas corpus claiming ineffective assistance of counsel. He alleges failure of his state court trial attorney to move for dismissal after a violation of New York's Speedy Trial Act. N.Y.Crim.Proc.Law § 30.30. The writ must be granted for the reasons stated below.

### I. *Facts*

#### a) *Chronology*

On April 15, 1977, an attempted armed robbery occurred at the Able Wire and Frame Company in Brooklyn. Messrs. Intermore and McGuire were picking up a payroll. Someone yelled "freeze." Intermore turned, was shot, and fell to the ground. McGuire exchanged shots with two bandits (Transcript of Dec. 8, 1986 hearing, A.M. session at 44–45, hereinafter "TR").

Critical to this case are the dates when petitioner was within the jurisdiction following the crime. If he could have been arrested in New York and brought to trial, the State's speedy trial rule would have run. That fact and a failure of his attorney to move to dismiss under the State's Speedy Trial Rules determines whether he has been denied effective counsel.

Detective Nannery was assigned to investigate the attempted robbery (TR P.M. session at 82). He traced a reported license plate number to a blue Cadillac, owned by Eulah Dickson, and from her got the name of petitioner, her boyfriend, as the previous owner of the car (TR P.M. at 82–83). Intermore then identified petitioner from photographs as the person who shot him (TR A.M. at 45 and P.M. at 83). McGuire was unable to identify petitioner and in fact identified someone else (TR A.M. at 45).

The police had two addresses where petitioner was known to live: 123 Nostrand Avenue, his mother's apartment, and 297

Lenox Road, the home of his girlfriend (TR P.M. at 92–93). Upon obtaining petitioner's name from his girlfriend, Dickson, police officers also talked to petitioner's sister, Richardine Garrett, in an attempt to get in touch with him. Neither Dickson nor Garrett was informed that petitioner was a suspect. Each of them said that they did not know where he was. Upon learning from his sister of the police inquiry, petitioner had his brother, Isaiah, call the police department (TR A.M. at 19–20 and 89). Petitioner possibly got on the phone himself. Neither he nor his brother were informed of any warrant.

The day after the shooting, Detective Nannery inquired at the Brooklyn Public Library whether petitioner was on the staff (TR A.M. at 9). He was told that personnel records could be checked two days later, but evidently he never followed this lead. Nannery visited petitioner's girlfriend on April 23rd, and claims to have seen her another time, either several weeks or several months later (TR P.M. at 93–94). On Nannery's April 23rd visit, petitioner's girlfriend still claimed not to know where he was (TR P.M. at 85). Nannery did not inform the girlfriend that petitioner was being sought in connection with the crime.

An arrest warrant was not issued until April 28, 1977. On May 3rd, a librarian at the Brooklyn Public Library received a call from petitioner and returned it, (TR A.M. at 10), speaking to him at his mother's phone number.

Warrant Officer Lee received a copy of the warrant on May 9th. He first attempted to execute it about a week or ten days later, by visiting the girlfriend's apartment. He found no one home, but was told by neighbors or the superintendent that petitioner was around. The officer returned about five more times over the next ten months, until the arrest was made on March 7, 1978. *See* Stipulation entered Dec. 8, 1986.

No further efforts were made to find or contact petitioner at his two known Brooklyn addresses, except that Nannery drove by "daily" on his way to work and looked for the blue Cadillac (TR P.M. at 97). No stakeout or surveillance was ever organized or conducted (TR P.M. at 103–104). No phone calls were made, messages left, or letters sent to the petitioner at either address (TR P.M. at 93); he might well have been unaware of the fact that there was an arrest warrant. Nannery never checked social security records in order to trace any possible employment (TR P.M. at 95). He never returned to the library to follow up on his initial visit (TR P.M. at 99).

Petitioner's two sisters, (TR A.M. at 96, 110–111), and his state lawyer, (TR A.M. at 30–31), all testified that petitioner was almost constantly around the neighborhood. They saw him there frequently during the period when the state claims he was absent from the jurisdiction.

On May 5th, Detective Nannery subpoenaed the phone records of petitioner's girlfriend and mother (Respondent Exhibit R). They led him to send a teletype and later a photo and arrest warrant to Officer Frazier of the Charleston, South Carolina police department on May 19th. (TR P.M. at 102). In response, Nannery received a call from Frazier on June 3rd (TR P.M. at 102). Frazier said that a few weeks earlier he had seen someone matching petitioner's description with a blue Cadillac and New York plates in Charleston. He later told Nannery about second-hand reports mentioning something vague about a postcard, petitioner and Augusta, Georgia (TR P.M. at 67).

On June 10th, Detective Nannery requested a subpoena for the release of further phone records (Respondent Exhibit R). These records show phone calls to Charleston, S.C. and Augusta, Ga., both before and after April 15th, the date of the crime. Library records, however, show that petitioner visited the Brooklyn Public Library on June 17th and June 21st, and was interviewed at about that time for a possible job there (TR A.M. at 12 and 14).

In mid-August, Detective Nannery received a report from Detective Jones in Augusta, Georgia that he had heard that petitioner might be residing in a nearby community (TR P.M. at 87). In October, Nannery did another auto registration check, and found that the petitioner's

brother had been the registered owner of the blue Cadillac since May.

Petitioner applied for a job with the Parks Department in Brooklyn in January, 1978 (TR P.M. at 26–27). He claims to have worked during the fall of 1977 at the Rugby movie theatre in Brooklyn; it has since closed and no extant records of its employees have been produced (TR P.M. at 25). On March 7, 1978, while having lunch at his girlfriend's home, petitioner was arrested by a warrant officer. More than ten months had elapsed since the issuance of the warrant.

The post-arrest delays were extensive. They are described below since they involve mixed issues of law and fact concerning reasons for trial adjournments.

b) *Exhaustion of State Remedies*

Petitioner has exhausted all available state remedies. His conviction on charges of attempted robbery in the first degree and assault in the second degree was affirmed without opinion. *People v. Whaley*, 88 A.D.2d 1113, 451 N.Y.S.2d 540 (2d Dep't 1982). An application for leave to appeal was denied by the New York Court of Appeals.

In May 1983, the petitioner moved to vacate the judgment of conviction on the ground of ineffective assistance of counsel because no speedy trial motion had been filed. *See* N.Y.C.P.L. § 440.10. The motion was denied by the trial court in March 1985 on the ground that the ineffectiveness claim had already been considered and rejected on direct appeal of the conviction. *See* N.Y.C.P.L. § 440.10 2(a). In June 1985 petitioner's application for leave to appeal the denial of the motion to vacate was denied by the Appellate Division. Defendant then filed this petition for a writ of habeas corpus.

II. *Law*

a) *Federal Habeas Corpus*

■ Petitioner must establish the following: first, that his state trial attorney rendered less than "reasonably effective assistance," *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); and second, that preju-

dice resulted, measured by a standard of "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. Reasonably effective assistance of counsel is determined by considering the totality of the circumstances in view of the "prevailing professional norms" for legal representation. 466 U.S. at 688, 104 S.Ct. at 2065. The "essence" of an ineffective assistance claim lies in determining whether the adversarial balance between the defense and the prosecution was so upset by counsel's errors that the conviction was unfair. *Kimmelman v. Morrison*, — U.S. —, —, 106 S.Ct 2574, 2583, 91 L.Ed.2d 305 (1986).

The relevant facts, "in the sense of a recital of external events and the credibility of their narrators," *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953), were never fully and adequately presented in this case in the state forum. The defendant's original appeal led to affirmation of his conviction without opinion, and his subsequent motion to vacate the conviction was denied without addressing the merits of the claim.

■ Since habeas corpus petitions involve "the very gravest allegations, . . . the opportunity to be heard, to argue and present evidence, must never be totally foreclosed." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). Upon an appropriate factual showing of the kind made here, federal courts are required to grant an evidentiary hearing to habeas corpus applicants. *Harris v. Nelson*, 394 U.S. 286, 291, 89 S.Ct. 1082, 1086, 22 L.Ed.2d 281, *reh'g denied*, 394 U.S. 1025, 89 S.Ct. 1623, 23 L.Ed.2d 50 (1969).

As required by federal case law, a full evidentiary hearing was held by this court on December 8th, 1986. The evidence adduced at that hearing strongly supports petitioner's contention that he was denied effective assistance of counsel.

b) *State Law*

Petitioner's claim of ineffective assistance rests mainly on his attorney's failure

to make a motion to dismiss under New York Criminal Procedure Law § 30.30. That section requires dismissal if the prosecution is not ready for trial within six months of commencement of the action. At the times in question it read as follows:

1. Except as otherwise provided ... a motion [to dismiss] must be granted where the people are not ready for trial within:

(a) six months of the commencement of criminal action wherein a defendant is accused of one or more offenses at least one of which is a felony; ....

Among the periods excluded in computing the six-month period were to be those "resulting from a continuance granted by the court at the request of, or with the consent of, the defendant or his counsel. ..." N.Y.C.P.L. § 30.30 4(b). Also to be excluded were periods resulting from the "absence or unavailability" of the defendant. That provision excluded

the period of delay resulting from the absence or unavailability of the defendant. A defendant must be considered absent whenever his location is unknown and he is attempting to avoid apprehension or prosecution, or his location cannot be determined by due diligence. A defendant must be considered unavailable whenever his location is known but his presence for trial cannot be obtained by due diligence;

....

N.Y.C.P.L. § 30.30 4(c). This provision was amended in 1984, but with no intention to address the issues raised by petitioner. *See* 11A N.Y. Criminal Procedure Law § 30.30 at 52 (McKinney 1981 & Supp.1987) (Commentary by J.W. Bellacosa). It now reads:

(c) the period of delay resulting from the absence or unavailability of the defendant or, where the defendant is absent or unavailable and has either escaped from custody or has previously been released on bail or on his own recognizance, the period extending from the day the court issues a bench warrant pursuant to section 530.70 because of the defendant's failure to appear in court where required, to the day the defendant subsequently

appears in the court pursuant to a bench warrant or voluntarily or otherwise. A defendant must be considered absent whenever his location is unknown and he is attempting to avoid apprehension or prosecution, or his location cannot be determined by due diligence. A defendant must be considered unavailable whenever his location is known but his presence for trial cannot be obtained by due diligence;

....

Additional delays on the People's part after commencement of the trial will also be included in this six month calculation unless such "unreadiness is due to some exceptional fact or circumstance." N.Y.C.P.L. § 30.30 3(b); *see also People v. Anderson*, 66 N.Y.2d 529, 535–536, 498 N.Y.S.2d 119, 122, 488 N.E.2d 1231, 1236 (1985).

New York law respecting the violation of this "speedy trial" statute requires of the defendant only a prima facie showing that there has been a total delay of longer than six months. Once this is established, the burden shifts to the State to prove that certain periods of time should be excluded under § 30.30 4 in order to negate the petitioner's contention that the six month limitation has been violated. *See People v. Berkowitz*, 50 N.Y.2d 333, 349, 428 N.Y. S.2d 927, 936, 406 N.E.2d 783, 792 (1980).

In the case at bar, there were several periods of delay. The longest disputed period is the ten months and seven days between issuance of the arrest warrant on April 28, 1977 and arrest on March 7, 1978.

The state concedes that the following delays were chargeable against it under § 30.30: two months and 26 days from the March 7, 1978 arrest to the filing of the indictment on June 2, 1978; 19 days from February 21 to March 12, 1979, when there was an adjournment at the People's request; and 22 days from April 17 to May 9, 1979, as a result of another adjournment at the People's request. The total of these undisputed delays amounts to four months and five days.

In addition to the ten months prior to arrest, petitioner contends that other post-

arrest delays should also be chargeable against the People: 14 days between the filing of the indictment on June 2, 1978 and arraignment on June 16, 1978; and the periods from January 8 to February 21, and March 12 to April 17, 1979, totalling two and a half months, during which time, the petitioner alleges, the defense was misled as to the prosecution's state of readiness.

■ Under State practice, since there is substantial evidence to support petitioner's contention of over 17 months of actual delay, the People would have "the burden of proving" that part or all of this time should be excluded. *See People v. Berkowitz*, 50 N.Y.2d 333, 349, 428 N.Y.S.2d 927, 936, 406 N.E.2d 783, 792 (1980). We need not decide whether that burden is one of coming forward or of persuasion and how high that burden should be under federal habeas corpus practice, *cf. People v. Lenox*, 50 N.Y.2d 351, 359, 428 N.Y.S.2d 937, 941, 406 N.E.2d 793 (1980) ("claim was without serious merit"). That standard would more than be satisfied by the evidence adduced under any conceivable state or federal burden of proof rule. The legal consequences which follow from the "facts" as determined by this court require application of state law on what constitutes an excludable delay and federal law on the right to effective counsel.

Since the People have already conceded over four months of delays, if two additional months are not excludable, the six month threshold was surpassed. If it is determined that over six months of delay are in fact chargeable to the People, the ineffective assistance claim will be presumptively valid. Reasonably effective assistance under such circumstances would require of counsel the filing of a § 30.30 claim, absent some acceptable reason for not doing so. If timely made, it is probable beyond a reasonable doubt that a § 30.30 motion would have been granted, thus precluding successful prosecution.

## III. *Pre-Arrest Delay*

The first and longest delay is that which occurred between the issuing of the warrant for petitioner's arrest on April 28, 1977 and his apprehension and arrest by Warrant Officer Lee on March 7, 1978. A period of delay resulting from the "absence or unavailability" of the defendant is excludable under N.Y.C.P.L. § 30.30 4(c). A defendant is legally absent under this section of the statute whenever 1) "his location is unknown and he is attempting to avoid apprehension" or 2) "his location cannot be determined by due diligence." N.Y. C.P.L. § 30.30 4(c).

The first step in assessing "absence" under § 30.30 is to determine whether the suspect's location was unknown, and, if so, whether he was attempting to avoid apprehension. N.Y.C.P.L. § 30.30 4(c). In *People v. Bratton*, 103 A.D.2d 368, 480 N.Y. S.2d 324 (2d Dep't 1984), *aff'd* 65 N.Y.2d 675, 491 N.Y.S.2d 623, 481 N.E.2d 255 (1985), the court found that the defendant's location was unknown. The police knew the defendant's address but upon inquiry found that neighbors and friends professed ignorance as to his whereabouts. The police, however, did not simply rely on the neighbors' lack of knowledge. They proceeded to place the defendant's known residence under surveillance for one hour a day for six continous weeks with no success.

*People v. Tower*, 18 A.D.2d 284, 239 N.Y. S.2d 212 (4th Dep't 1963), involved a case where the defendant's address was known but police were told by the defendant's mother, with whom he resided, that she did not know where he was. The police subsequently had extensive contacts with family members and friends, who relayed messages, and even with the defendant himself, in a phone conversation that was arranged without knowing his location. It was clear that the defendant was directly informed that the police were trying to apprehend him, was advised to turn himself in, and consciously chose to evade apprehension. 18 A.D.2d at 285, 239 N.Y.S.2d at 213.

In the present case, unlike the precedents relied upon by the State, there were no occurrences that lead to the conclusion that petitioner's location was unknown. Only a few initial inquiries were made. After the arrest warrant was issued, there

were no documented visits by Detective Nannery to either of petitioner's two regular places of abode. There was no stake-out. There were no letters, messages or phone calls.

Closely linked to the requirement that the defendant's location be unknown is the necessity of showing that the defendant was attempting to avoid apprehension. N.Y.C.P.L. § 30.30 4(c). A classic situation where New York courts have found defendants to be "absent" and avoiding apprehension involves the use of an alias. *See, e.g., People v. Rivera,* 63 A.D.2d 972, 405 N.Y.S.2d 766 (2d Dep't 1978) (12 different addresses and 10 different names); *People v. Manley,* 63 A.D.2d 988, 406 N.Y.S.2d 108 (2d Dep't 1978) (alias and different addresses to avoid prosecution). Failure to appear on a scheduled court date also supports a finding adverse to defendant. *See, e.g., People v. Miller,* 61 A.D.2d 1036, 403 N.Y.S.2d 110 (2d Dep't 1978) (living with codefendant who did apparently appear); *People v. Cohen,* 66 A.D.2d 901, 411 N.Y.S.2d 411 (2d Dep't 1978) (bail forfeited and failed to appear at rehabilitation center as ordered). Petitioner here has an uncommon name—Zenous Whaley. He never used an alias or changed addresses and never failed to appear for a scheduled court date.

Respondent submits several cases standing for the proposition that a defendant does not have to actively flee, but can be considered to have avoided apprehension even if he passively waits for the police to find him. In *People v. Morton,* 22 N.Y.2d 674, 291 N.Y.S.2d 367, 238 N.E.2d 755 (1968), *rev'd with dissenting op.,* 28 A.D.2d 913, 282 N.Y.S.2d 960 (2d Dep't 1967), the defendant, after committing a crime in Nassau County, moved to Queens "to avoid arrest" and continuously and openly resided and worked there until his arrest seven years later. 28 A.D.2d 913, 282 N.Y.S.2d 960, 961. "Both the defendant and his brothers were aware at all times that defendant was wanted by the police." *Id.* The facts in the instant case are quite different. None of the initial inquiries by the police informed petitioner or his family members that he was in fact "wanted" by the police.

The State contends that because the defendant's guilt was established by jury verdict in the State trial, his knowledge that he was wanted by the police should be assumed for purposes of this petition. The proposition is doubtful. Innocence or guilt is not relevant under the State speedy trial rule; it cannot be used as retrospective evidence to determine decisively defendant's knowledge that he was a fugitive. Petitioner's case is a far different one from that of *Morton,* where the defendant's knowledge of an outstanding warrant came directly from his brother, who had been so informed by the police.

In any event, the inference of knowledge of guilt is not persuasive. Petitioner was convicted at trial on far from overwhelming evidence. Intermore was the only one able to identify him, and this witness' recollection was based upon the brief glance he was able to obtain before being shot. Nobody else was able to identify petitioner, including McGuire, who exchanged gunfire with the assailants. McGuire actually identified someone else in the line-up, and testified at trial that he had never seen petitioner before (TR A.M. at 45).

Petitioner never changed his address or moved to a new residence. Rather, he continued to stay at his mother's or girlfriend's apartment, as the police knew was his custom. Under these circumstances, it cannot be assumed that Whaley knew that he was wanted by the police.

█ *People v. Cohen,* 66 A.D.2d 901, 411 N.Y.S.2d 411 (2d Dep't 1978), *People v. Patterson,* 38 N.Y.2d 623, 381 N.Y.S.2d 858, 345 N.E.2d 330 (1976), and *People v. Miller,* 61 A.D.2d 1036, 403 N.Y.S.2d 110 (2d Dep't 1978), all deal with defendants who did not use aliases or actively avoid apprehension. The People claim that these cases require a finding that petitioner was attempting to avoid apprehension. The salient distinguishing factor in these cases is that unlike petitioner here, the defendants all were initially in custody and subsequently failed to appear for a court date (*Patterson* and *Miller*) or a court ordered obligation (*Cohen*). Obviously, the fact that he has already been in custody and then flees

is highly significant in determining whether a defendant is a knowing fugitive. That situation is not the one we face.

Respondent's alternative argument is that petitioner actively fled the jurisdiction in an attempt to avoid being apprehended. Its primary evidence is the report of Officer Frazier from Charleston, South Carolina, that on or about May 13, 1977, he saw petitioner along with a blue Cadillac bearing New York plates. This piece of information is the People's key link in establishing that petitioner was actively attempting to avoid apprehension. Detective Nannery's knowledge of this report may also be an important factor in trying to prove, under the second prong of § 30.30 4(c), that the defendant's location could not be determined by due diligence.

The extent of Officer Frazier's evidence is that he saw petitioner a few times within a two or three day span, and supposedly verified his identity by checking with the locals of the Charleston community. There is some question whether, upon inquiry, he was initially told "that is Cat & Henry's son" (TR P.M. at 62) or "that is Cat & Henry's son, Zenous" (TR P.M. at 75). When he observed this newcomer from New York, Officer Frazier had no information regarding the crime. It was not until a week had passed that the teletype from Detective Nannery arrived, followed by the photo and arrest warrant. By that time, neither the newcomer—nor the blue Cadillac was around for Frazier's further verification.

Possible identity problems also exist. Petitioner has submitted that his brother, George Whaley, was often mistaken for him, even by friends (TR A.M. at 101). George Whaley was also the registered owner of the blue Cadillac as of May 3, 1977, and is known to have travelled to Charleston from time to time. This background casts some doubt upon whether the man Officer Frazier spotted in South Carolina in mid-May actually was the petitioner. Even assuming that petitioner was in South Carolina, and was seen by Frazier, his presence there is only established for two or three days. One reliable witness talked to Whaley at his home phone number on May 3rd, and petitioner interviewed for a job at the Brooklyn Public Library on both June 17th and June 21st. In the interim, no attempts were made in Brooklyn to contact or locate petitioner, with the exception that warrant officer Lee rang the girlfriend's bell once in late May, and found nobody home.

On all the evidence, it can be concluded beyond a reasonable doubt that: 1) petitioner was not actively fleeing in an attempt to avoid apprehension, and 2) it was not reasonable for Detective Nannery, given the aggregate of information available, to assume that petitioner had fled the jurisdiction, and hence to tailor his efforts at apprehending the suspect to such an assumption.

Even if petitioner and not his brother was in South Carolina, there is no evidence that he stayed for more than a few days. Petitioner had not been informed of the warrant for his arrest nor had he been forbidden to leave the jurisdiction. It would be unreasonable to require of a suspect under these circumstances the complete curtailment of all travel that might occur in the course of normal life. The subsequent information provided by Officer Frazier, and later by a Detective Jones, regarding a possible hideout in Augusta, Georgia, amounts to no more than secondhand reports or rumors, and is unsubstantiated by any corroborating evidence. If petitioner had been "hiding out," it is unlikely that he would have shuttled back and forth between New York, South Carolina and Georgia.

The reasonableness of Detective Nannery's reliance on Officer Frazier's information reflects on the overall diligence of police efforts to locate petitioner. Detective Nannery did not receive Frazier's information until June 3rd, a full five weeks after the arrest warrant was issued on April 28th. At the very least, the due diligence test regarding the efforts to locate petitioner must be applied to these entire five weeks, since Nannery had no information that petitioner was not in New York. Subpoenaed phone records did ultimately lead Detective Nannery to Frazier, but before June 3rd, no evidence indicated that

Whaley was in either South Carolina or in Georgia. Moreover, the records show phone calls made from Brooklyn to Charleston, South Carolina and Augusta, Georgia, both before and after April 15th, the date of the crime. Petitioner's family and girlfriend concededly had friends and relatives in those areas. Thus, the telephone records hardly support the inference that petitioner was on-the-run.

Analysis of the police department's diligence must be divided into two time periods, pre- and post-June 3rd, when the possibility that petitioner was in South Carolina came to Detective Nannery's attention. Before June 3rd, minimal efforts were made to apprehend Whaley at either of his two known addresses. A "later exercise of due diligence ... cannot serve to cure the initial deficiency." *People v. Roy*, 102 A.D.2d 876, 477 N.Y.S.2d 29, 30 (2d Dep't 1984). Even if Detective Nannery could establish convincingly that as of June 3rd he had clear evidence that the defendant had fled the jurisdiction, the five weeks prior to that time remain devoid of substantial police efforts to locate the defendant. Up until that time there were no stakeouts, which almost certainly would have apprehended the defendant if they had been organized promptly. Even crediting the South Carolina and Georgia evidence fully, petitioner was in his usual haunts in this district in most of May and June. There were no follow-up visits to either of Whaley's addresses or to the Brooklyn Public Library. After June 3rd, the police work was equally unacceptable, because the police should have assumed that petitioner was readily available in New York.

■ Applying New York standards of diligence—as we must—it is hard to conclude that the New York courts would have been satisfied with this police work. In *People v. Bratton*, 103 A.D.2d 368, 480 N.Y.S.2d 324 (2d Dep't 1984), *aff'd*, 65 N.Y.2d 675, 491 N.Y.S.2d 623, 481 N.E.2d 255 (1986), the defendant was only deemed to be "absent" after a six week stakeout of one hour a day proved fruitless. In *People v. Walters*, 511 N.Y.S.2d 957 (A.D.2d Dep't 1987), the court found that the police exercised due diligence in trying to locate the defendant where they had "canvassed" the defendant's known address on seven

separate occasions, had left messages for him and had taken other appropriate investigatory actions including checking for forwarding addresses at the post office.

By contrast, a case remarkably like the one before us, *People v. Peterson*, 115 A.D.2d 497, 498, 496 N.Y.S.2d 231, 232 (2d Dep't 1985), led to a finding of lack of diligence. In *Peterson* both of the defendant's addresses were known to the authorities and neither was put under surveillance during a two-year period. No effort was made to contact the defendant's mother to leave a message for him. The police did not check with the Post Office or the Social Security Administration. Additionally, the court found that there was "no indication in the record that the defendant was attempting to avoid apprehension on the instant charge since admittedly he was never notified as to this indictment until his arrest...." *Id.* Under these circumstances, the court held that the defendant could not be deemed to have been absent.

## IV. *Post-Arrest Delay*

The second period of delay in question is the two week period between Whaley's indictment on June 2, 1978 and his arraignment on June 16, 1978. A delay between indictment and arraignment is generally chargeable to the People unless the defense requested or consented to the delay. N.Y.C.P.L. § 30.30 4(b). Failure by a defendant to object to a delay has been deemed consent. *See People v. Gaggi*, 104 A.D.2d 422, 423, 478 N.Y.S.2d 732, 734 (2d Dep't 1984); *People v. Brown*, 113 A.D.2d 812, 813, 493 N.Y.S.2d 568, 569 (2d Dep't 1985).

Petitioner claims that he had no forum in which to voice an objection, and that therefore the People's burden of proving consent, even if by failure to object, cannot be sustained. In *People v. Brown*, 113 A.D.2d at 813, 493 N.Y.S.2d at 569, however, the defendant, whose first indictment had already been dismissed on January 6, 1983, was reindicted on January 17th and not arraigned until January 27th. Apparently the defendant there did not have any forum in which to voice an objection, but the court nevertheless held that the ten day delay

was excludable since the defendant "consented by failing to object." No mention is made of lack of forum.

Admittedly, the New York law on this point is rather scant. None of the cases discuss the issue at length. Their conclusions are reached in small phrases which are attached to sentences that deal with substantially larger time spans than simply the delay between indictment and arraignment.

■ The most recent authorities on point are *People v. Brown*, 113 A.D.2d 812, 813, 493 N.Y.S.2d 568, 569 (2d Dep't 1985) and *People v. Gaggi*, 104 A.D.2d 422, 423, 478 N.Y.S.2d 732, 734 (2d Dep't 1984). They are Second Department cases which specifically include the time from indictment to arraignment in calculating the period of excludable delay. The delay from indictment to arraignment must be deemed excludable in petitioner's case since he was indicted and tried in the Second Department, where *People v. Brown*, 113 A.D.2d 812, 493 N.Y.S.2d 568 (2d Dep't 1985), would have controlled the disposition of the issue. The earlier Fourth Department cases of *People v. Thill*, 75 A.D.2d 709, 427 N.Y.S.2d 125 (4th Dep't 1980), and *People v. McCaffery*, 78 A.D.2d 1003, 433 N.Y.S.2d 909 (4th Dep't 1980), relied upon by petitioner, are not directly on point and, in any event, are not controlling since they are from a different department from that in which petitioner was to be tried. The two weeks between Whaley's indictment and arraignment are not charged against the People as needless delay.

The third period at issue involves two adjournments of trial at the People's request, which were consented to by the defendant. Petitioner contends, however, that his consent was obtained under false pretenses, and that the People were not, in fact, ready for trial. Under N.Y.C.P.L. § 30.303 3(b), if the prosecution becomes "unready" at any time after its initial declaration of readiness, this period of unreadiness will be added to the total time of unexcused delay. Such unreadiness can be excluded if "some exceptional fact or circumstance," N.Y.C.P.L. § 30.30 3(b), subsequently "makes it impossible for the People to proceed." *People v. Anderson*, 66 N.Y.2d 529, 534, 498 N.Y.S.2d 119, 122, 488 N.E.2d 1231, 1234 (1985). The term "exceptional fact or circumstance" is not defined in the statute, but analysis of cases where such a situation has been held to exist shows two common factors: "(1) that the delay was due to circumstances beyond the control of the District Attorney's Office; and (2) that it prevented the prosecution from being ready for trial." *People v. LaBounty*, 104 A.D.2d 202, 204, 482 N.Y.S.2d 652, 654 (4th Dep't 1984).

The record in this case shows adjournments on consent in 1979 on January 12th, February 1st, March 12th, March 28th, and April 4th, among others. *See* Stipulation entered Dec. 8, 1986. These are the dates that are relevant to the present inquiry. Whaley's trial attorney testified that in order to procure this series of adjournments the District Attorney's Office made continued representations that the witnesses were either sick or on vacation (TR A.M. at 27–28, 47–50, 86–88). In fact, the two witnesses in question, McGuire and Intermore, were incarcerated on tax-evasion charges for several months during this period. McGuire was incarcerated from January 8th until March 9th. Intermore was incarcerated from March 12th until May 4th (TR P.M. at 11). The District Attorney's office was supposedly informed by Intermore that McGuire was on vacation until March 12th (TR P.M. at 5), and did not discover the truth of the matter until "mid-March" (TR P.M. at 9).

The People contend that off-the-record statements cannot be used to impeach the record, and that the on-the-record adjournments on consent should be dispositive of the matter. Calendar notations alone "do not comprise a binding determination as to whether in fact the time span covered by a particular adjournment is to be excluded...." *People v. Berkowitz*, 50 N.Y.2d 333, 349, 428 N.Y.S.2d 927, 936, 406 N.E.2d 783, 792 (1980). *In re Benjamin S.*, 55 N.Y.2d 116, 447 N.Y.S.2d 905, 432 N.E.2d 777 (1982), stands only for the proposition that "off-the-record promises made in the plea bargaining process will not be recognized where they are flatly contradicted by the record...." 55 N.Y.2d at 120, 447 N.Y.S.2d at 907, 432 N.E.2d at 779. This

rule is based on the policy of assuring the "continued validity and usefulness of the plea bargaining process." *Id.* It cannot be read so broadly as to dispose of the speedy trial issue at hand.

Where there is a sharp issue of fact and credibility, determination of whether a period of alleged delay should be excluded from the six month speedy trial limit "must be made following an adversarial proceeding at which the defendant has an adequate opportunity to contend that the time is not excludable." *People v. Berkowitz,* 50 N.Y.2d at 349, 428 N.Y.S.2d at 936, 406 N.E.2d at 792. *See also People v. Samilenko,* 80 A.D.2d 878, 439 N.Y.S.2d 630 (2d Dep't 1981) (question of whether defendant explicitly consented to adjournment merits a hearing).

In applying the criteria set forth by the court in *People v. LaBounty,* 104 A.D.2d 202, 204, 482 N.Y.S.2d 652, 654 (4th Dep't 1984), the court must determine whether the delay in question was caused by "circumstances beyond the control of the District Attorney's Office." The unavailability of a witness due to illness or vacation falls within this category. Since neither circumstance was present, the question is whether it was beyond the control of the District Attorney's Office to discover the real reason for the witnesses' unavailability and to notify the defendant.

In the case of McGuire, who was incarcerated from January 8th until March 9th, the facts show that the District Attorney's Office was misled by Intermore's representation that McGuire was on vacation. Before being informed by Intermore of McGuire's supposed vacation, the District Attorney's Office had not made any contact with either witness to inform them of the status of the trial proceedings or to determine their availability (TR P.M. at 10). Further investigation might have disclosed the truth, but since Intermore and McGuire were business partners (TR P.M. at 5) and had no previous criminal records, the District Attorney's Office could reasonably believe them and not investigate further. This does not explain, however, why there were adjournments on both January 12th and February 1st. If the District Attorney's belief was that McGuire's unavailabil-

ity would last until March 12th, the initial adjournment should have been for the full extent of that period. This raises the possibility that more was known, and that adjournments were being used improperly to delay the trial.

Facts surrounding Intermore's incarceration raise further questions. His imprisonment lasted from March 12th until May 4th, and the District Attorney's Office concedes that they learned the truth sometime in mid-March. Despite this fact, the District Attorney elicited further "consent" adjournments from the defendant on March 12th, March 28th, and April 4th on the basis of illness or vacation. The People did not inform the defendant of the witnesses' incarceration until April 17th (TR P.M. at 9), at which time there was a further adjournment at the People's request. *See* Stipulation entered Dec. 8, 1986. The Assistant District Attorney originally in charge of the case testified that had he known of the witnesses' incarceration he would have asked that they be produced to testify at trial (TR P.M. at 6). It is unclear why, once the truth was learned in mid-March, there were continued adjournments if the District Attorney was in fact ready for trial as is claimed. No explanation is offered for the People's failure to notify the defendant in a timely manner nor is there any justification for the People's failure to produce Intermore to testify.

From mid-March until April 17th, the circumstances surrounding the witnesses' unavailability were clearly not beyond the control of the District Attorney's Office. The District Attorney's "control" of the situation during the period of McGuire's incarceration is less clear since McGuire was released prior to the time the District Attorney had conceded knowledge of his incarceration.

The final determination of whether the delays caused by adjournments are excludable due to "exceptional circumstances" calls for an exercise of the court's good sense in analyzing the facts. *People v. LaBounty,* 104 A.D.2d 202, 204, 482 N.Y. S.2d 652, 654 (4th Dep't 1984). The record as a whole raises a significant question

concerning the District Attorney's actual readiness for trial. The New York Speedy Trial Act "could become a mockery if an assertion of readiness, without any substantiation, excuses needless delay." *People v. Dean*, 45 N.Y.2d 651, 656, 412 N.Y. S.2d 353, 356, 384 N.E.2d 1277, 1279 (1978).

■ Whether there was deliberate withholding of information by the District Attorney's Office or only negligence is not decisive here. The attorney who was originally in charge of the case was transferred in April, 1979. A new assistant was then assigned the case (TR P.M. at 8). It is possible that there was some confusion during this period, but this is not enough to excuse unnecessary trial delays. Inadvertant postreadiness delay will not be excused, "no matter how pure the intention." *People v. Anderson*, 66 N.Y.2d 529, 536, 498 N.Y.S.2d 119, 124, 488 N.E.2d 1231, 1236 (1985). Consent adjournments are not meaningful if they are "premised on the false impression, however innocent, created by the People, that they were ready at any time for trial." *People v. Blue*, 114 Misc.2d 383, 388, 451 N.Y.S.2d 591, 594 (Sup.Ct.1982).

■ Based upon the evidence adduced at the hearing, the conclusion is inescapable that the People were not ready for trial and caused unnecessary delays by making repeated misleading requests for adjournments on consent. If the District Attorney's Office actually believed that McGuire was on vacation until March 12th, the original adjournment should have been for the entire period. It was not necessary to request adjournments piecemeal nor was it necessary to keep the defendant uninformed. After learning about Intermore's incarceration in mid-March, the People should have given notice to the defendant. Procedures were available for producing that witness. The subsequent adjournments on March 28th and April 4th were unnecessary. The failure to produce the witness, the unnecessary delay in informing the defendant, and the People's repeated requests for adjournments, taken together, give rise to a strong inference that the People were not ready to proceed to trial. The periods of delay from January 8th to February 21st and from March 12th to April 17th, totaling two months and 18 days, are not excludable, and should be charged to the People.

## V. *Adequacy of Counsel*

■ Finally, we are faced with the issue of adequacy of representation. Petitioner's trial attorney acknowledged under oath that he had been negligent in failing to move for dismissal under N.Y.C.P.L. § 30.30. He agreed that a motion to dismiss on this ground would have been successful. Apart from his admission, the evidence is overwhelming that a motion to dismiss for failure to comply with the State's Speedy Trial Act would have been granted. There was no excuse for his failure to make the motion. In light of the "prevailing professional norms" for legal representation petitioner was rendered less than "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687–688, 104 S.Ct. 2052, 2064–2065, 80 L.Ed.2d 674 (1984). "[B]ut for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694, 104 S.Ct. at 2068. Therefore, the petitioner was denied effective counsel.

## V. *Conclusion*

The entire pre-arrest delay of ten months and seven days is chargeable to the People. The post-arrest delays resulting from the disputed "consent" adjournments, totaling two months and 18 days, must also be chargeable to the People. Together with the four months and five days of conceded delays, this totals some 17 months of delay chargeable to the People, which is well above the six month threshold prescribed by N.Y.C.P.L. § 30.30.

Reasonably effective assistance provided by counsel should have included taking notice of these inordinate delays and filing a § 30.30 motion for dismissal. There is a probability beyond a reasonable doubt that this motion would have been granted and the entire proceeding would have been dismissed for a violation of the New York Speedy Trial Act. But for counsel's unprofessional errors, the result of the proceed-

ing would have been different beyond any reasonable doubt.

Petitioner has been denied his constitutional right to effective assistance of counsel. Pursuant to this denial he was wrongly convicted and incarcerated. His petition for the writ of habeas corpus is granted.

Since petitioner has served his sentence and a dismissal was mandated under New York law, a conditional grant of the writ is not appropriate. The writ is granted. The conviction is ordered expunged from the record.

So ordered.