Zenous WHALEY, Petitioner–Appellee,

v.

Ramon J. RODRIGUEZ, Chairman, New York Board of Parole, Respondent–Appellant.

No. 226, Docket 87–2212.

United States Court of Appeals, Second Circuit.

Argued Sept. 29, 1987.

Decided Feb. 10, 1988.

---

Richard T. Faughnan, Asst. Dist. Atty., Brooklyn, N.Y., (Elizabeth Holtzman, Dist. Atty., and Barbara D. Underwood, Asst. Dist. Atty., Brooklyn, N.Y., of counsel), for respondent-appellant.

Lynn W.L. Fahey, The Legal Aid Society, New York City (Philip L. Weinstein, New York City, of counsel), for petitioner-appellee.

Before VAN GRAAFEILAND, MESKILL and NEWMAN, Circuit Judges.

VAN GRAAFEILAND, Senior Circuit Judge:

Ramon J. Rodriguez, Chairman of the New York Board of Parole, appeals from a 1987 judgment of the United States District Court for the Eastern District of New York (Weinstein, C.J.) which granted Zenous Whaley's petition for habeas corpus relief and vacated a 1979 judgment of the Supreme Court, Kings County, convicting Whaley of first degree robbery and second degree assault. Although clothed in the

garb of ineffective assistance of counsel, the district court's decision, 656 F.Supp. 1512, was in fact an interpretation of New York's Speedy Trial Act, Crim.Proc.Law § 30.30. The district court concluded that Whaley had been denied the effective assistance of counsel because his lawyer failed to make a pretrial motion to dismiss for violation of section 30.30, a motion the district court believed would have been granted. Since we conclude that the motion would have been denied, there could not be any prejudice from counsel's failure to make the motion, and the ineffective assistance claim necessarily fails.

Section 30.30(1)(a) provides that charges against a defendant accused of a felony must be dismissed on the defendant's motion where the People are not ready for trial within six months of the commencement of the action. Subdivision 4(c) of the same section tolls the limitation period during any delay resulting from the absence or unavailability of the defendant. It provides further that "[a] defendant must be considered absent whenever his location is unknown and he is attempting to avoid apprehension or prosecution, or his location cannot be determined by due diligence." The six-month period also is tolled for other reasons, including the making of pretrial motions and demands to produce (§ 30.-30(4)(a)), continuances granted at the request of or with the consent of the defendant or his counsel (§ 30.30(4)(b)), lack of counsel (§ 30.30(4)(f)), and continuances granted because of the unavailability of evidence material to the People's case (§ 30.30(4)(g)).

■ The merits of Whaley's argument that section 30.30 was violated must be weighed without regard to the fact that he was convicted. However, in determining whether Whaley had delayed the trial by attempting to avoid apprehension, some consideration should be given to the nature and strength of the charges against him. One who knows that, if caught, he surely will be convicted of a serious felony is more likely to attempt to avoid apprehension than is one who stands only an outside chance of being found guilty of a minor misdemeanor. For this reason, we examine the State's evidence against Whaley in greater detail than did the district court.

On April 15, 1977, Joseph Intermor, Vice President of Able Wire and Frame Corporation, located on Alabama Avenue in Brooklyn, New York, drove William McGuire, the company president, to the bank to pick up money for the company payroll. Upon their return, Intermor parked in front of the factory and alighted from his car on the driver's side. He was promptly ordered to "freeze", and, upon turning around, he observed a man standing near the rear of his car, some seven or eight feet away, pointing a gun at him. Despite the lack of any hostile move on Intermor's part, the man shot and wounded him. McGuire, who was carrying a gun for which he had a permit, got out of the car on the passenger side and exchanged shots with the man who shot Intermor and the assailant's cohort, who was somewhere in front of the parked vehicle. Both would-be robbers ran away, apparently unharmed.

While this was taking place, George Kinzel, the operator of a lunch wagon truck, was in his truck which was parked on an intersecting street around the corner from the Able Wire factory. After hearing what sounded like firecrackers coming from Alabama Avenue, Kinzel saw two men running very rapidly from that direction past his truck. Kinzel described them as "tall, about five—five-ten, 160, 170 pounds, colored fellows", a description that fitted Whaley very well. However, Kinzel was unable to positively identify either running man as Whaley.

Mr. Kinzel saw one of the men drop a gun, quickly pick it up and stick it in his pants. The two men ran to a blue Cadillac parked ahead of Kinzel's truck, entered it and left. Suspecting that the men had been involved in something unlawful, Kinzel copied the license number of the Cadillac and later turned it over to the police.

Police investigation of the Cadillac disclosed that it was owned by appellee Whaley and, until 1976, was registered in his name, with license plate number 659KRR. In 1976, Whaley transferred registered

ownership of the vehicle to his live-in girl-friend, Eula Dixon, and had the license plate number changed to 974CUU, the number of the getaway Cadillac. On May 4, 1977, less than three weeks after the shooting of Intermor, registered ownership of the car was transferred to Whaley's brother, and a third license plate, 814GIQ, was secured. During all this time, Whaley used the car as his own. Indeed, when Miss Dixon was interviewed by the police on the day of the shooting, she said that Whaley had the car in his possession on that day.

Having been led directly to Whaley by Kinzel's information, the police were able to check his criminal record. In summarizing this record at the time of sentencing, the State trial judge noted that Whaley had been in almost constant difficulty with the law from the time he was a child; that he "ha[d] a juvenile record dating from the age of thirteen and had two favorable terms of probation in the juvenile court; that he ha[d] an adult record which include[d] some ten previous arrests for offenses such as robbery, assault, burglar [sic], grand larceny." The judge noted further that Whaley served a three-month jail term in 1969, was convicted of assault in the third degree, and also was placed on probation in connection with the theft of some property from a garage. It was not surprising, therefore, that the police had a picture of Whaley in their files.

On April 17, Detective Nannery interviewed Intermor at the hospital and showed him photographs of seven men, one of whom was Whaley. The State court, after hearing testimony at a *Wade* hearing and viewing the photographs in question, held that they "were in no way suggestive or indicative of the Defendant by name or in any other manner." Intermor nevertheless identified Whaley as his assailant. Some three months later, while visiting Detective Nannery at the precinct where Nannery was stationed, Intermor again selected Whaley's picture, this time from among some twenty pictures on a persons-wanted bulletin board. Finally, on April 28, 1978, some seven weeks after Whaley was arrested, Intermor selected Whaley from a lineup that was conducted in the presence of and with the approval of an attorney from the same Legal Aid office that represents Whaley on this appeal. At the conclusion of the *Wade* hearing, the State court found that the lineup was conducted in a fair and proper manner and in accordance with the requirements of due process. Based on the foregoing findings, the State court denied Whaley's motion to suppress in-court identification of him by Intermor, which thereafter was duly and convincingly made.

Whaley was convicted, and the Appellate Division affirmed without opinion. On his direct appeal, Whaley contended, among other things, that he had been denied his Sixth Amendment right to the effective assistance of counsel because his lawyer had not made a speedy trial motion. Since this is the only issue now raised as a basis for habeas corpus relief, we limit our discussion to that issue.

The People argued in the Appellate Division that the delay between the issuance of the arrest warrant and Whaley's indictment was caused by his absence or unavailability. To support this contention, the People's brief referred to the efforts of Detective Nannery and Officer Lee to apprehend Whaley, which were discussed in the People's brief and are referred to later in this opinion. The People then argued that "[t]he adjournments between the indictment and the trial were in large part the result of defense requests, or adjourned with his consent", and that "there were no meritorious speedy trial claims." The substance of the People's argument on this point is set forth in an appendix to this opinion.

After leave to appeal from the Appellate Division's affirmance was denied by the Court of Appeals, Whaley instituted a coram nobis proceeding, Crim.Proc.Law § 440.10, before the same judge who presided at his trial, arguing that he was not afforded effective assistance of counsel because of counsel's failure to make a speedy trial motion. The court denied the motion, holding that the issue already had been determined on the merits on an appeal

from the judgment of conviction. The court also said:

> Prejudice being a required ingredient of proof of ineffective assistance of counsel, defendant has not shown to this court that his counsel's performance was seriously deficient. This court, after scrutinizing defendant's allegation of ineffective assistance of counsel, finds that the affidavits of defendant's availability is [sic] at most cumulative and do not give rise to a meritorious claim of ineffective assistance of counsel.

Whaley's petition for leave to appeal from the denial of his coram nobis application was denied by the Appellate Division, with a memorandum notation that "[t]he issue sought to be raised was raised and considered on the defendant's direct appeal from the judgment." There is no mention of this memorandum in the district court's opinion.

■ To prevail on a claim of ineffective assistance of counsel Whaley must show that his lawyer's failure to make the section 30.30 motion fell below "an objective standard of reasonableness" with respect to professional competence, *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that he thereby suffered prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. at 2068. We seriously doubt that the facts known to Whaley's lawyer prior to trial would have prompted a lawyer of reasonable competence to make a section 30.30 motion. We need not decide that issue, however, since we conclude that the motion, if made, would have been denied. Resolution of this issue hinges, of course, upon how section 30.30 is interpreted, *e.g.,* what constitutes "due diligence" under the statute. This is a matter for the New York courts to decide. "We are not at liberty to conjecture that the [state] trial court acted under an interpretation of the state law different from that which we might adopt and then set up our own interpretation as a basis for declaring that due process has been denied." *Gryger v. Burke,* 334 U.S.

728, 731, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948). *See Lockett v. Montemango,* 784 F.2d 78, 84 n. 10 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 120, 93 L.Ed.2d 66 (1986); *Schaefer v. Leone,* 443 F.2d 182, 185 (2d Cir.), *cert. denied,* 404 U.S. 939, 92 S.Ct. 277, 30 L.Ed.2d 251 (1971). We find no merit in Whaley's contention that he did not receive a State court hearing on this issue. Evidence as to the reasons for the delay in the trial was in the record and was discussed at length in the Appellate Division briefs. Whaley's present attorneys, who represented him on his appeal to the Appellate Division, were content to argue ineffective assistance of counsel, their principal argument for reversal, on an unembellished record. *See People v. Lane,* 60 N.Y.2d 748, 469 N.Y.S.2d 663, 457 N.E.2d 769 (1983) *(mem.).* The State trial court, in denying appellant's subsequent coram nobis application, found his affidavits to be "at most cumulative." Under the circumstances, the coram nobis judge was not required to conduct an evidentiary hearing. *People v. Garrow,* 52 A.D.2d 993, 383 N.Y. S.2d 429 (1976) *(mem.);* Cr.P.L. §§ 440.10, subd. 2, par. [b], 440.30, subds. 2, 4; *see also People v. Walters,* 127 A.D.2d 870, 511 N.Y.S.2d 957 (1987) *(mem.).*

■ Assuming for the argument that the district court did not err in making a de novo review of whether section 30.30 was violated, we are not bound to accept its findings concerning reasonableness and due diligence but may exercise our own plenary scope of review. *United States v. Simmons,* 786 F.2d 479, 482–83 (2d Cir. 1986); *United States v. Rodriguez,* 786 F.2d 472, 476 (2d Cir.1986). Moreover, we are not bound to accept the district court's findings of basic historical fact, if they are clearly erroneous. Viewing the evidence in the light of these well-established principles, we are satisfied that it did not warrant the grant of habeas corpus relief.

■ Although Whaley customarily designated his mother's address, 123 Nostrand Avenue, Brooklyn, New York, as his place of residence, it appears that he often resided in Apartment C at 297 Lenox Road with his girlfriend, Eula Dixon. Within

two hours of the attempted robbery, Detective Nannery was able to trace the Cadillac to the latter address. He went there immediately and established surveillance, hoping to locate the Cadillac and its occupants. After waiting about an hour, Nannery went to the apartment, which had Whaley's name on the door, and talked with Miss Dixon. She told him that Whaley had left with the car that morning and she hadn't seen him since. Nannery then went to a branch of the Brooklyn Public Library, where Whaley was supposed to be employed, but it was closed. Later that night, Nannery again interviewed Miss Dixon and also Whaley's mother. Nannery returned to the Lenox Road apartment the following morning, but no one was there. He also checked with the branch and main offices of the Brooklyn Public Library to see whether they could assist him in locating Whaley; they could not. Although Nannery interviewed Miss Dixon on a number of occasions thereafter, she continued to maintain that she did not know where Whaley was. Accordingly, Detective Nannery filed Whaley's name and pertinent information with the National Crime Information Center, a computerized information system operated by the Federal Bureau of Investigation, which makes such information available to criminal justice agencies to assist them in the detention and apprehension of criminal offenders. 28 C.F.R. Part 20.

Detective Nannery then had the Kings County District Attorney's Office prepare a complaint charging Whaley with robbery and assault and secure a warrant for Whaley's arrest. He subpoenaed Miss Dixon's telephone records and learned that she had made a number of calls to James Island, South Carolina, one of which was to the residence of Whaley's aunt and the other was to the home of a man named Richardson. On May 19, 1977, Nannery contacted Corporal Frazier of the Charleston County, South Carolina police department and was informed that Corporal Frazier had seen Whaley just a few days before sitting in a blue Cadillac with New York license plates that was parked in front of Richardson's home. Nannery sent Frazier a copy of the warrant and a photograph of Whaley. Fra-

zier testified that, before receiving the warrant, he saw Whaley on three different occasions on James Island, South Carolina, and he made an in-court identification of Whaley as the person he saw. He also talked to three persons who knew Whaley, one of whom was Whaley's uncle, and they all identified the person seen by Frazier as Whaley.

On August 8, 1977, Nannery contacted Frazier and was informed that Frazier had received information that Whaley had sent a postcard from Augusta, Georgia to a friend on James Island. On August 17, 1977, Nannery contacted Detective B.T. Jones of the Augusta Police Department and requested his assistance. He sent Jones a copy of the warrant and Whaley's photographs, together with an Augusta telephone number that had been called by Miss Dixon.

In addition to the foregoing, Detective Nannery drove by Miss Dixon's apartment on an almost daily basis to check whether Whaley's Cadillac was there. He testified that he did not "constantly knock on her door", since he was checking her long-distance telephone records and "she [might] decide not to use the telephone any more at which point I would be out of luck." Nannery also entered the new license plate number of the Cadillac, 814GIQ, in the Felony Vehicle computer alarm board.

Officer Leonard Lee, a warrant officer with the New York City Police Department, was given Whaley's arrest warrant after it had been computerized and cleared through the central warrant office. Sometime in late May or early June, he called at Miss Dixon's apartment and no one was there. During the months that followed, he returned to the apartment at least six times. On five occasions, there was no answer. On the sixth occasion, Whaley answered the door and was arrested.

An explanation of why we reject the district court's finding of ultimate fact concerning lack of due diligence must begin with the district court's preliminary and subordinate findings. First and foremost, we hold that the district court's finding that Whaley did not know he was wanted

by the police, 656 F.Supp. at 1515, 1519, is clearly erroneous. Whaley was told by his sister, his mother, Miss Dixon, and Mrs. DeMarco, a Public Library employee, that the police were looking for him. Moreover, the district judge himself elicited the fact that Whaley knew he was wanted:

THE COURT: Mr. Whaley, you knew that the police were looking for you, didn't you?

THE WITNESS: Yes, I did.

\* \* \* \* \* \*

THE COURT: But you knew they were looking for you?

THE WITNESS: Yes, I did.

THE COURT: Why didn't you go to the police?

THE WITNESS: I was scared. I have been arrested almost 11 times.

The district court apparently finds significance in Whaley's testimony that his brother, and possibly he, called the police department and "[n]either he nor his brother were informed of any warrant." 656 F.Supp. at 1515. The call was made at 11:45 p.m. on the day of the shooting, and Whaley had not as yet even been identified as the assailant. Of course there was no warrant. The district court states that Nannery "never checked social security records in order to trace any possible employment." *Id.* The district court neglects to mention Nannery's testimony that he did not make the check because the information was privileged and he "knew [he] wouldn't get any information from them."

The district court stated that it was unreasonable for the police to pursue their efforts to locate and arrest Whaley in South Carolina and Georgia. *Id.* at 1520. This is not a finding of historical fact that is subject to the clearly erroneous standard of review, *Utica Mutual Ins. Co. v. Fireman's Fund Ins. Cos.*, 748 F.2d 118, 122 n. 3 (2d Cir.1984); *United States Fidelity & Guaranty Co. v. Royal Nat'l Bank*, 545 F.2d 1330, 1333 (2d Cir.1976), and we disagree with it. In our opinion, the subpoenaing of Dixon's telephone records and the subsequent efforts to trace the calls to Whaley constituted good police work.

■ The district court says there were no letters, messages or phone calls from the police to Whaley. *Id.* at 1519. Assuming the police knew where to write or call, the only message they could have given Whaley was that they wanted him, something he already knew. The district court criticizes the police for not maintaining stakeouts, which, it says, would "almost certainly have apprehended [Whaley]." *Id.* at 1521. According to records maintained by New York State's Division of Criminal Justice Services, during 1977, over 190,000 felonies were reported to the police of Kings County. Among them were 453 murders, 23,986 robberies, 60,652 burglaries and 14,993 aggravated assaults. The merits of Whaley's contentions concerning lack of stakeouts must be viewed in the light of what reasonably could have been expected of the police under all the circumstances. "It was never the intent of the Legislature to require dismissal of criminal charges when the delay in readiness cannot be attributed to the People's negligence or fault or is beyond their control." *People v. Bratton*, 103 A.D.2d 368, 373, 480 N.Y.S.2d 324 (1984), *aff'd*, 65 N.Y.2d 675, 491 N.Y.S. 2d 623, 481 N.E.2d 255 (1985).

We are satisfied that, had the State trial court been presented with a motion to dismiss under section 30.30, it would have held that the police had exercised due diligence in their attempts to apprehend Whaley and that none of the delay in apprehending him was chargeable to the People. *See People v. Walters, supra*, 127 A.D.2d at 870, 511 N.Y.S.2d 957.

Contrary to the defendant's contention, there were sufficient undisputed facts in the motion papers for the court to determine, without holding a hearing, that the police had exercised due diligence in trying to locate him. Specifically, it was undisputed that on seven occasions between December 24, 1982 and October 28, 1983, the police canvassed the defendant's last known address and spoke to the building superintendent and another individual, leaving a message for the defendant with the latter and also sent for the former arrest reports of the defendant to obtain further contact information

and checked with the Post Office for a forwarding address.

*Id.; see also People v. Manley,* 63 A.D.2d 988, 406 N.Y.S.2d 108 (1978).

Accordingly, we are left to decide what periods following Whaley's arrest would have been charged to the People had a pretrial motion to dismiss been made. The People concede that the period between the arrest and the indictment (87 days) is chargeable to them, as are the periods between February 21, 1979 and March 12, 1979 (19 days) and between April 17, 1979 and May 9, 1979 (22 days). *See* Appendix. These three periods total 128 days. Since the People were permitted six months of delay (183 days), 55 days of grace remained.

The district court correctly found that, when an Assistant District Attorney attempted to arrange for McGuire's appearance in court, the Assistant was misled by Intermor's representation that McGuire was away on vacation. 656 F.Supp. at 1523. However, the district court clearly erred in finding that this deception took place in January 1979. A transcript was made of the State court proceeding held on February 21, 1979, during which the case was adjourned to March 12. In pertinent part, the colloquy between the court and counsel at that hearing was as follows:

MR. FELDMAN: [Assistant District Attorney] Judge, I have a problem I'd like to advise the Court of; I thought Miss Berger had mentioned it.

I called my complainants yesterday; there are two complaining witnesses Mr. Inknore (phon.) and Mr. McGuire. Mr. McGuire failed to identify defendant at a line up. Mr. McGuire is on vacation and will not be back until March 12th.

THE COURT: Under the circumstances he would not be one you would call.

MR. FELDMAN: First of all, I would call him because there were statements made to him by the perpetrator making out certain elements of the crime.

And, Mr. Mercer, if I didn't call him he would call him anyway and I'm advising

Mr. Mercer now he's not available until after the 12th.

\* \* \* \* \* \*

THE COURT: When will that witness be available?

MR. FELDMAN: March 12th he will be back.

I apologize to Mr. Mercer; I learned this late yesterday.

THE COURT: Well, under the circumstances then there's nothing we can do.

It is obvious from this transcript that the District Attorney's Office was not informed of McGuire's asserted absence on vacation until February 20. The district court therefore erred in charging the People with the period from January 8 to February 21 (44 days). This being so, we need not decide whether the district court was correct in charging the People with the period from March 12 to April 17 (36 days). If these 36 days are added to the 128 days, for which the People accept responsibility, the total of 164 days is well within the 183 days permitted by section 30.30(1)(a).

For all the foregoing reasons, the judgment of the district court is reversed, and the matter is remanded to that court with instructions to deny the application for a writ of habeas corpus.

### APPENDIX

Respondent's Brief, *People v. Whaley,* Appellate Division, Second Department, at 15–16:

Appellant was arraigned on June 16, 1978. Having made $10,000 bail, the Legal Aid Society was relieved and appellant was advised to retain an attorney.[1] The matter was adjourned five more times for appellant to retain an attorney. It was not until September 20, 1978 that appellant appeared with S. Hal Mercer, who requested an adjournment until October 24, 1978 to make his motions. (Court File Endorsements).

The Court file reflects that the ensuing adjournments, until the *Wade* hearing in June 1979 occurred as follows:

| DATE | ADJOURNED UNTIL |
| --- | --- |
| September 20, 1978 | October 24, 1978, at the request of defendant |

---

**1.** See the minutes of arraignment, June 16, 1978.

| DATE | ADJOURNED UNTIL |
|---|---|
| October 24, 1978 | November 13, 1978, at the request of defendant |
| November 13, 1978 | December 6, 1978, at the request of defendant |
| December 6, 1978 | January 12, 1979, with consent |
| January 12, 1979 | February 13, 1979, with consent |
| February 13, 1979 | February 20, 1979, ready and passed |
| February 21, 1979 | March 12, 1979, at request of the People |
| March 12, 1979 | April 4, 1979, with consent |
| April 4, 1979 | April 17, 1979, with consent |
| April 17, 1979 | May 9, 1979, at the request of the People |
| May 9, 1979 | May 24, 1979, with consent |
| May 24, 1979 | June 1, 1979, ready and passed |
| June 1, 1979 | June 6, 1979, ready and passed |
| June 6, 1979 | June 12, 1979, to conduct a hearing |

At the conclusion of the *Wade* hearing on June 13, the defendant requested that the case be adjourned until July 25, 1979.[2]

The court file endorsements reflect that on July 25, the defendant was not present, and prior to trial the defense requested four additional adjournments until the case was once again marked ready and passed on September 9.[3] The indictment continued in that status until it was moved to trial on October 2, 1979.

---

**2.** It appears that this request was made so that appellant could submit further motions (See *Wade* hearing p. 146–148).

**3.** In the interim, appellant submitted a motion to dismiss the indictment in the interest of justice on August 8. That motion was denied on September 4 and again the case was adjourned at appellant's request.